1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN VANCE ROCHA,                        No. C 11-5729 SI (pr)

      Petitioner,                        **ORDER DENYING HABEAS
                                         PETITION AND DENYING
    v.                                 CERTIFICATE OF APPEALABILITY**

VIMAL SINGH, warden,

      Respondent.
_____/

**INTRODUCTION**

John Vance Rocha filed this *pro se* action seeking a writ of habeas corpus under 28
U.S.C. § 2254.  The matter is now before the court for consideration of the merits of the habeas
petition.  For the reasons discussed below, the petition will be denied.

**BACKGROUND**

Following a jury trial in Santa Clara County Superior Court, Rocha was found guilty of
second degree murder and was found to have personally and intentionally discharged a firearm
in the commission of that offense.  He was sentenced to 40 years to life in prison.

The California Court of Appeal described the evidence at trial in depth.  That lengthy
description is repeated here because Rocha's habeas claims are very much related to the evidence
at trial, i.e., it matters to the analysis where in the shared residence the shooting took place, who
was doing what when the victim was shot by Rocha, and what Rocha was thinking when he fired
the shot.  In this action, Rocha claims that the trial court erred in not giving a jury instruction
about defense of one's habitation (even though a self-defense instruction was given) and that

counsel was ineffective in not requesting an involuntary manslaughter instruction and a redaction of parts of Rocha's police interview wherein the sergeant expressed skepticism about his story.

[1.]   The Prosecution's Case

Diana Jeffreys was killed by a gunshot wound in the armpit region of her right side which caused internal bleeding in her right lung. The bullet that lodged near her spine was fired from a distance beyond three feet. It could have been fired from the gun that was found in defendant's bedroom.

On May 27, 2006, at approximately 1:30 in the morning, Kenneth Holland, wearing only boxer shorts and a tank top, and bleeding from the hand, ran out of the house at 820 Bellomy Street and towards a group of people standing on the front porch of a house across the street. He was shouting: "Help. Call 9-1-1. My girlfriend's been shot. I'm not lying." One of the people on the porch called 9-1-1 for Holland and gave the dispatcher Holland's address, then passed the phone to him. Holland told the dispatcher: "Listen, I'm in the house, and I'm in there with my girlfriend. And this guy-she's in the kitchen and she's talking to him in the kitchen. And he yelled at her, 'Shut up,' and she tells him, she says, hey wait a second. Don't tell me to shut up. You can't tell me to shut up. That's rude. [¶] ... [¶] Then he came out-then he came out of the room with a gun and shot her. [¶] ... [¶] Shot her. [¶] ... [¶] Bleeding bad right now. [¶] ... [¶] I-I-tried to grab the gun out of his hand. Then I ran across the street and called you guys. [¶] ... [¶] He's white. [¶] ... [¶] In his 40s. [¶] ... [¶] He's wearing a dark top and shirt. And the cops are here right now." [footnote omitted.]

The house at 820 Bellomy in Santa Clara had four rooms set up as individual bedrooms and a common kitchen and bathroom. The responding police officers found a woman lying face down on the floor in one of the bedrooms. The entire front of her shirt was soaked in blood, from her right shoulder, down her arms, and onto her legs. She had a very weak pulse. The television in the room was on; it was not loud. A marijuana cigarette and rolling papers were on the window sill near the bed. Jeffreys was removed from the premises.

In defendant's bedroom, police found a holstered revolver wedged between the bed and a file cabinet. The gun contained six live rounds and one spent round. The gun was swabbed for DNA on the barrel, the hammer, and the grip. Kenneth Holland was eliminated as the contributor to the DNA profile from the grip. Defendant was the source of the DNA found on the grip. Too little genetic material was gathered from the barrel and the hammer to determine whose DNA was at those locations.

Santa Clara Police Officer Michael Carleton spoke with Holland at the scene for approximately half an hour. Holland did not appear to be under the influence of drugs, and did not smell of burnt marijuana. Holland told the officer that he was in his girlfriend's bedroom and heard his girlfriend and defendant arguing in the kitchen. She returned to the bedroom. A short time later, while Holland was "sitting on the bed," Holland saw defendant "out of the corner of his eye" enter the room from the hallway. Holland heard a "pop" and looked back in the direction of his girlfriend. He saw her holding her bleeding abdomen. He saw defendant pointing a small handgun at Jeffreys, then at him. Holland first attempted to help Jeffreys, then advanced on defendant and grabbed his arm. There was a struggle, during which Holland's finger got caught between the trigger and the trigger guard. Then the gun came loose, and Holland fled.

Several hours later, Holland was interviewed at the police station by Santa Clara Police

2

Sergeant Rick Souza. The interview lasted 30 to 40 minutes and was audio/videotaped. [footnote omitted] Holland's statement to Souza was consistent with his statement to Carleton, except that he told Souza that he was "laying" on the bed when Jeffreys was shot. Holland also said he had his back to Jeffreys; when he heard the "pop" he turned and looked.

Paul Grilli also lived at 820 Bellomy Street. He was asleep in bed when he was awakened by voices in the kitchen. He recognized one voice as Jeffreys, but did not recognize the male voice. They were yelling, and doors were closing really hard. Then he heard a "pop noise." He listened for 10 minutes and then fell back asleep. About 10 or 15 minutes later, he heard someone going in and out, in and out. He did not hear anything else and slept until the police awakened him in the morning.

Chris Salazar also lived at the Bellomy Street house on May 26 and 27, 2006; his bedroom was located between defendant's and Jeffreys's. [footnote omitted] He went to sleep at about 10 p.m. and was awakened "in the middle of the night." He heard Jeffreys say, "All I know is you didn't have to say it that way." It sounded as if she were in the kitchen. Then defendant said something; he was in his room. Jeffreys called defendant "a fat fuck." It appeared to Salazar that Jeffreys went back to her room and that the argument was over. Then he heard defendant's door squeak open; defendant came out of his room and said, "We're going to have peace one way or another." About three minutes went by before Salazar heard a sound "like a cap gun go off." Next he heard a struggle that sounded as if Jeffreys's boyfriend were pushing defendant out of the room. He heard Holland say, "Don't hurt me, don't hurt me," and defendant say "Do you want some of this?" This went on for about five minutes. Then Salazar opened the door of his room and looked out. Defendant was standing in front of the door to Jeffreys's room, staring at her, with a gun in his hand. He did not see Holland at that point. Salazar briefly looked into Jeffreys's room and then quickly went back into his room and closed the door. He thought he heard Jeffreys say, "He shot me." He stayed in his room for about 10 minutes until it was "really, really quiet." He was going to call the police. He looked into Jeffreys's room and saw her "laying down on the floor moaning." He did not see defendant or Holland anywhere. He went out of the front door and met up with the police.

Santa Clara Police Officer Norm Henry was flagged down by a "very excited" Salazar. Salazar told him that defendant and Jeffreys had gotten into an argument and that Jeffreys had called defendant "a fat fuck." Salazar heard a "snap, snap" sound and then heard Jeffreys's boyfriend pleading with defendant not to shoot him. He waited for a while, then looked into the hallway, where he saw defendant leaving Jeffreys's room with a gun in his hand.

Holland testified at trial. He worked at a liquor store 30 to 35 hours a week, seven days a week. He met Jeffreys in early 2006. They began dating, and by May of 2006 he was seeing her every day, most often at her house. Jeffreys had her own room but shared the kitchen and bathroom with defendant and two other men. Holland would see defendant now and then when he visited Jeffreys and exchanged greetings with him. Prior to the night Jeffreys was killed, Holland never had an argument or cross words with defendant.

On the night Jeffreys was killed, Holland worked from approximately 8:00 p.m. to midnight. After work, he went to Jeffreys's house. She let him in. When he arrived, it was quiet, and no one was in the hallways. He did not know who, if anyone, was home. He went directly to her bedroom. It was his plan to spend the night. He was not under the influence of any drugs. He told Jeffreys he was tired and was going to lay down, watch television, and go to sleep. She said she was going to take out her contact lenses and would be in her room shortly.

3

While Holland was lying on his side on the bed watching television, he could hear Jeffreys in the kitchen running water and humming to herself. After a few minutes, Holland heard defendant say to Jeffreys, "Shut the blankety-blank up" and "You're making a lot of noise." He then heard Jeffreys tap on the door to defendant's room and say, "You don't have to be so disrespectful. I wasn't being loud or anything, and please don't disrespect me like that by yelling at me like that." Jeffreys came back into the room and asked Holland if he had heard defendant. Holland said that he had, and advised Jeffreys to "[j]ust let it go, don't pursue it." Jeffreys went back to the kitchen and Holland went back to watching television. A minute or two later, Holland heard a few footsteps. He heard Jeffreys come back into the room and then heard a "rustle" and a sound like a "crack" that startled him. He looked over and saw Jeffreys sitting on the floor. Her body was facing the door, but she was looking up and extending her right arm above her shoulder palm facing out. She was bleeding profusely from her mouth. Defendant was standing over her. He was holding a gun clasped in both hands, pointing it at her head. Holland said something like "You can't do that.... What are you doing? What have you done? We have to call 9-1-1.... She's ... bleeding profusely." Defendant was shaking the gun and saying "Now you'll shut up, won't you? Now you'll shut up ... profanities." Holland was trying to get off the bed to help Jeffreys. Still holding the gun in both hands, defendant pointed the gun at him and said, "Don't move or I'll shoot you, too," and pointed the gun back at Jeffreys. Holland said, "John, don't[,][d]on't," because defendant kept pointing the gun back and forth between Jeffreys and him, and Holland was afraid defendant was going to shoot again. He could see that Jeffreys was getting more limp on the floor, and Holland wanted to get to her to help her.

Holland lunged towards defendant and grabbed for the gun to stop him from shooting Jeffreys again. Holland's left hand got caught between the handle and the hammer of the gun. As they grappled for control of the gun, defendant tried to point it toward Holland and shoot him, while Holland pushed the gun back. In this way they moved down the hall for four or five minutes. When Holland felt defendant's hand weakening, he let go of the gun, turned around, and ran down the hallway and out of the house. He ran across the street to a house where some college kids were having a party on the porch and told them, "Somebody just shot my girlfriend ... I need to call 9-1-1." Although Holland did not realize it at the time he was struggling with defendant over the gun, Holland's hand was bleeding from the thumb and he had injuries on his chest. He told the dispatcher, and later police officers, what had occurred.

On cross-examination, Holland admitted that he had suffered a felony conviction for fraudulent use of a credit card in 1987; a conviction for giving false information to a police officer, also in 1987; a misdemeanor conviction for petty theft in 1995; and a conviction for petty theft with a prior conviction in 1999. He admitted that he brought marijuana to Jeffreys's house on May 27, 2006, the day Jeffreys was shot, but he denied that he smoked it. He did not remember telling either the first police officer he spoke with, or Sergeants Kazem or Souza, that he had been sitting on the bed at the time of the shooting.

[2.]   <u>The Defense Case</u>

At the time of the shooting, defendant was 43 years, weighed 265 lbs., worked as a sales representative for a heating and cooling company, and had lived at 820 Bellomy for seven and a half years. He had known Chris Salazar for 12 years, but Salazar had only been living in the house for four months. Diane Jeffreys had lived at the house for three months, and defendant barely knew her except to say "hi and goodbye." A fourth co-tenant, Paul Grilli, had lived there for two years, but defendant had no association with him, other than to exchange "casual niceties." Defendant did not know Jeffreys's

boyfriend, Ken Holland, either, except to say "hi and goodbye." Prior to the shooting, he had never had any negative encounters with Holland. He had had one negative encounter with Jeffreys, about her leaving the front door open.

On May 23, 2006, defendant had received a call from his coin dealer informing him that he had won a coin on which he had placed a bid at an auction. He was "ecstatic" because he had been trying to acquire that particular coin for seven years. The coin was an 1834 Alexander the First memorial ruble and it was very significant because he already had the direct companion piece to that coin, the 1839 Alexander the First Battle of Borodino ruble. On the evening of May 24, he told Chris Salazar what he was paying for the coin, what its real value was, and how much more valuable it would be if he could get the third coin in the three-coin set. He and Salazar were in the kitchen at the time. Defendant believed that Diana Jeffreys and Ken Holland were present in the residence. He saw Diana Jeffreys, and he had seen Holland earlier that day, but not at the time he made his announcement to Salazar.

Defendant's coin collection was valued at slightly more than $19,000. Ordinarily, defendant kept his coin collection in a safe deposit box, but he took it out of the box and brought it home with him on May 25, in anticipation of getting the new coin from the dealer. He wanted to see the two coins together so that he could "admire" them. He placed the portable fire safe box containing his coin collection between the nightstand and the bookshelf in his bedroom.

On May 26, when defendant came home from work, he passed Holland in the hallway on his way out of the house. Holland's facial features were contorted, and he "looked kind of depressed." When defendant got to his room, he unlocked the door, went in, turned on the television set, lay down on the bed and watched television. A little after 11:30 p.m., defendant heard somebody enter the residence. He was lying on his bed. He heard a male voice coming from Jeffrey's room say, "The only way we're going to get 'em is to take this guy out." Defendant thought the voice was referring to him. The voice also said something in regards to watching his comings and goings. Defendant had heard the voice before, but he did not know whose it was. Defendant became frightened. He retrieved his Russian Nagant 1895 7.62 revolver from the lower drawer of his file cabinet. He fully loaded it with all seven rounds in the cylinder and set it at the edge of his desk, cocked. Then he went back to bed and watched some more television.

The next thing that happened is that he came out of his room, used the bathroom, and had a conversation with Jeffreys in the kitchen. Their discussion was about a "loud discussion" she was having late at night with somebody he couldn't see. His conversation with Jeffreys was polite but at the same time somewhat heated and ended on a positive note. He proceeded to use the bathroom then went back to his room and resumed watching television. He believed Jeffreys went back to her room as well. The conversation between defendant and Jeffreys about the loud discussion occurred between 10:45 and 11:00 p.m.

At 11:30 p.m., defendant heard someone come inside the residence, and then he heard a conversation, but he couldn't make it out. He turned off the television and tried to get some sleep. However, he was still in fear for his safety and was unable to get to sleep.

He got up and ate some cookies at 1:15 a.m. Eating the cookies made him thirsty, so he got up to get something to drink out of the refrigerator. The first thing he noticed when he came out of his room was that the kitchen drawer where the knives were kept had been pulled out and left open. Then defendant saw Ken Holland standing with his back towards him, directly in front of the sink, illuminated by the light on the hood of the

5

stove. Defendant threw the cookie wrapper into the garbage can and flipped on the light switch. Jeffreys was standing at the threshold of her room, and said to defendant in a rude and obnoxious tone of voice, "You didn't have to tell me to shut up, you fat fuck."

At that moment, Ken Holland reached down into the sink and pulled a knife out of it. [footnote omitted.] Holland turned counter-clockwise towards defendant. Defendant said, "What are you doing with the knife?" Still standing in the doorway, Jeffreys said something along the lines of "get him," a couple of times. Then Holland gave defendant "this really weird expression" and lunged at him with the knife.

Defendant reached up and grabbed Holland's right arm. Defendant was holding Holland back to keep him from thrusting the knife at him. They struggled over the knife for about three minutes, moving towards defendant's room. During the struggle, Holland cut defendant's left arm at the elbow and scratched the upper part of his arm.FN5 That prompted defendant to reach for the gun with his right hand. He grabbed the gun. It was impossible to push Holland away and close the door on him. However, he pushed Holland away from the doorway, and Holland backed up when he saw the gun.

> FN5. When shown a photograph of his arm that did not show any blood, defendant described the cut as "more specifically a nick."

At this point, defendant testified, "I ... pull out the gun, coming down to fire it in his shoulder, and that's when he reaches up with his left hand grabbing the barrel of the gun." Holland still had the knife in his other hand. Holland jerked the gun loose from defendant's hand, causing defendant's index finger to get caught between the trigger and the trigger guard. When Holland pulled the gun forward, it discharged in Jeffreys's direction and she was hit.

Holland turned his head and looked at her. Defendant saw Jeffreys collapse out of the corner of his eye, but he kept his eyes on Holland. The distraction of Jeffreys getting hit and collapsing gave defendant the time he needed to regain control of the gun. Defendant and Holland struggled over the gun for three more minutes. Holland dropped the knife into the sink.

Defendant then pointed the gun at Holland's head and told him, "Now, do you want some more of this?" Holland responded, "Oh, don't hurt me. Don't hurt me." At this point, defendant grabbed Holland with his left hand and shoved Holland into Jeffreys's bedroom. Holland hit the bed so hard that the headboard bounced on the wall between Salazar's room and Jeffreys's room.

Defendant took up a position at the bedroom door because he "wanted to see how Diana was hurt." He could see that she was bleeding and had already collapsed. Defendant switched the gun to his left hand, and pointed it at the floor. He made the comment to Holland "if I can't get through to a phone, would you also try to get her help?"

While defendant was standing at the threshold of Jeffreys's room, Chris Salazar came out of his room. He saw the gun, looked into Jeffrey's room, and went back into his own.

After Salazar went back into his room, Holland tried to get out of the room and get a hold of the gun. At that point, defendant was frightened and bolted away from the door to flee into his own room. Holland pursued him, but defendant was too quick for him this time; he had already run into his room, shut the door and locked it. Once defendant was safely locked inside his room, he attempted to call the "direct Santa Clara PD" number, 615-4700, which is the number he usually called whenever there was a disturbance at the

6

house. He did not think to call 9-1-1 because he was so upset. There was no answer; he got a busy signal. He was scared; he could hear that Holland was washing the knife in the sink. Then he heard the knife being placed in the drawer, the drawer being closed, and Holland walking from the kitchen down the hallway out the door.

Defendant put the gun back in the holster, got dressed, and left the house. He left his coin collection in the room, because he "didn't know that that [the coin collection] was the object this person was after or not." He went to his car, which was parked a block to a block and a half from the house, started the car, let the engine warm up for maybe a minute or so, and drove to his workplace. He arrived at his workplace slightly after 2:00 a.m. He went there, rather than to the police department, because he "had access to the San Jose Police Association in the same plaza where I work; plus, in addition to that, I have access to the phone where I work; and thirdly, ... there is a newly installed video camera where I work where I could park my car at [¶] ... [¶][s]o the police could see that I'm not really fleeing the scene or fleeing ... town." However, defendant did not have a key to his workplace. He would have to wait until the arrival of a supervisor at 7:00 or 8:00 a.m.

Defendant sat in his car, under a surveillance camera, "exhausted from this whole situation of fighting with this guy," until the police showed up at 5:30 a.m. Defendant was taken into custody. He was later interviewed by Sergeant Souza and another officer at the police station between 7:00 and 8:00 a.m. on May 27. By that time, defendant had not slept for nearly 24 hours and he was "not totally" thinking clearly.

At trial, defendant denied that he ever handled the gun with both hands or pointed the gun at Jeffreys. He denied telling Jeffreys to shut up. He maintained that there was "nothing intentional" about that discharge of the gun "on [his] part."

Defendant admitted he was not completely candid with the police when they interviewed him. For example, defendant admitted at trial that he told the police he "pulled the gun out and shot and [was] trying to hit Kenny," but that did "not really" happen. He also admitted telling the police that he and Holland never touched each other. He explained that was "being facetious" when he told Souza that he kept his gun cocked in its holster "in a lot of instances."

Defendant also admitted that he failed to mention that he and Holland had a physical struggle before defendant found his gun. He admitted that he failed to mention that Holland grabbed the gun. He admitted that he failed to mention that when the gun went off, defendant's finger was between the trigger and the trigger guard, and Holland "had a hold of the barrel." Defendant did not tell Souza everything that happened because "the way the interview was proceeding was very prejudicial, very unobjective, and very unprofessional." Defendant was attempting to convince Souza that he was telling the truth about being the victim, but it was "to no avail." Toward the beginning of the interview, Souza told defendant: "Look me in the eye. I don't believe your story." At that point, defendant thought to himself, "Well, it's not for you to decide. It's going to be for a jury to decide." Souza made other comments as well, and told defendant that "nobody's going to believe what I have to say." Defendant often answered Souza's questions sarcastically because he believed Souza was "not going to believe anything I have to say anyway."

[3.]   Rebuttal

The video/audiotape of defendant's interview conducted by Sergeant Souza and Officer Kazem was played for the jury. Souza did not say at the start of the interview, "Look me

7

in the eye. I don't believe your story."

Defendant said that he went into the kitchen at approximately 1:00 a.m. to get a drink. Holland came at him with a butcher knife "trying to kill" him with it. Defendant grabbed a loaded pistol that he kept near his bed for security and "shot him-shot. Unfortunately, I missed him and I hit Diane." "I was trying to hit him, when he came at me with this knife. And it hit Diane."

Sgt. Souza asked defendant for permission to have evidence technicians search his car and residence. While defendant was filling out the consent form, he volunteered that Jeffreys "seemed to be egging [Holland] on" just before he fired, when Holland came at him with a knife. Defendant had "no idea" why Holland would want to attack him, but thought Jeffreys might have "put him up to it." Asked if he "had issues" with Jeffreys, defendant said that he had had issues with her "leaving the front door open at night in the middle of the night." He had talked to her about that earlier in the evening. He thought she left the door open to irritate him, and also because "she doesn't care, you know, about anybody else's wishes other than what she thinks," and "this way Kenny could come in or whoever else she wanted to invite in." They had discussed the issue "previously because she keeps doing it." But he did not consider it "a super serious issue."

Returning to the subject of the shooting, defendant said that while Holland was standing in front of the sink with the knife, Jeffreys was sitting in her bedroom "egging him on. Get him, get him, get him." Asked why he missed his target in such a small space, defendant said he didn't have enough time or enough room. Souza asked if it was "what you call a snap shot." Defendant said he was familiar with the term from a prior job with a security company and "that's exactly what it was." Immediately after the shot, "Kenny took the knife immediately [¶] ... [¶] try [ sic ] to stab me with it threw it back in the drawer and closed the drawer." Then Holland went into Jeffreys's room to look after her and defendant went into his room, threw the pistol over by his bed, immediately got dressed, locked the door and left the premises.

After he saw Jeffreys bleeding on the floor, he "was contemplating" calling the police "big time" but did not do so because "I figured they might not believe me" and the "[t]his woman could be dead ... and I'm on a murder charge."

Returning to Holland's possible motive for attacking defendant, defendant posited that [Jeffreys] might have encouraged Holland to cause him harm because of a combination of "the door thing" and the fact that he did not like it when she and Holland smoked "weed."

After going over the knife attack and shooting again in greater detail, Officer Kazem asked defendant if he would demonstrate how Holland attacked. Defendant did so, and at this point Souza commented that it was a "very unusual way to hold a butcher knife." Souza then told defendant that he was trying to understand the many "coincidences" that had occurred that night, and that if Diana lost her life because of a disagreement over a front door, that was "very tragic." Defendant responded, "No. There's more to it than that." Souza told defendant that witnesses reported hearing an argument between defendant and Jeffreys about noise in the house, and that she may have called him "fat." Defendant confirmed that [Jeffreys] was "yelling the fat thing as part of her obscenities."

Souza also told defendant that "somebody saw you standing in Diana's room with a gun in your hand," and he should keep in mind that "sometimes there's other people watching and listening and we don't know that right away." He told defendant that "maybe during the excitement of all this (inaudible) got a little foggy, a little confused, a little muddled.

8

So I would like you to ... think about maybe recapping in your own mind what happened and maybe reconsider how [¶] ... [¶][t]hese events occurred."

After that point, as defendant talked, Souza began to express skepticism at some of defendant's statements. For example, he said: "You're getting a little far out there. Cause this is what you have to understand, okay. You're trying to tell me ... that it was self-defense. All right. If it is, it is. If it isn't, it isn't. First you have to explain it to us what it makes sense." Defendant said, "Yeah." Souza then added that defendant's story so far would not make sense to the district attorneys or the jury, that it was not believable, or credible, and that he would like defendant to reconsider what he had told the officers.

After more probing questions, and defendant's denials that he shot Jeffreys on purpose because of his issues with her, Souza said, "I don't believe you, John."

Later, defendant admitted that just before Holland lunged at him with the knife, Jeffreys called him "obscenities about being fat." He told her he wanted her "to shut up."

After again explaining that he shot at Holland because Holland came at him with a knife, but he missed, and it was a "snap shot," defendant mentioned for the first time that he and Holland struggled over the knife. He said that after the shot, Holland left the knife on the counter.

Pressed repeatedly by the officers to explain why he had a cocked gun in a holster that night, defendant explained for the first time that he wanted to be sure the gun was readily available to him because between 11 and midnight he "heard all kind of weird people" coming into the house and that caused him to be scared. He said he heard someone say "maybe we should get rid of this guy." The interview concluded shortly thereafter.

Resp. Ex. 3, Cal. Ct. App. Opinion, ¶. 2-15.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Santa Clara County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. *See* 28 U.S.C. § 2254(b), (c). The parties do not dispute that

1   the state judicial remedies were exhausted for the claims in the petition.

2

3                                    **STANDARD OF REVIEW**

4           This court may entertain a petition for writ of habeas corpus "in behalf of a person in

5   custody pursuant to the judgment of a State court only on the ground that he is in custody in

6   violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The

7   Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose

8   new restrictions on federal habeas review.  A petition may not be granted with respect to any

9   claim that was adjudicated on the merits in state court unless the state court's adjudication of the

10  claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application

11  of, clearly established Federal law, as determined by the Supreme Court of the United States;

12  or (2) resulted in a decision that was based on an unreasonable determination of the facts in light

13  of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

14          "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

15  arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or

16  if the state court decides a case differently than [the] Court has on a set of materially

17  indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

18          "Under the 'unreasonable application' clause, a federal habeas court may grant the writ

19  if the state court identifies the correct governing legal principle from [the] Court's decisions but

20  unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  "[A] federal

21  habeas court may not issue the writ simply because that court concludes in its independent

22  judgment that the relevant state-court decision applied clearly established federal law

23  erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411.  A

24  federal habeas court making the "unreasonable application" inquiry should ask whether the state

25  court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

26

27

28

**DISCUSSION**

A.    Instructional Error Claim

    1.    State Court Rulings

Rocha claims here, as he did on appeal in state court, that his right to due process was violated because the trial court did not instruct the jury on justifiable homicide based on the defense of one's habitation.

    At the jury instruction conference after the evidence was presented, defense counsel requested that the court include CALCRIM 506 in the jury instructions.[1]   CALCRIM 506 is based on California Penal Code § 197, which provides, in relevant part that a homicide is justifiable "[w]hen committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous or tumultuous manner, to enter the

---

[1]CALCRIM 506, "Justifiable Homicide: Defending Against Harm to Person Within Home or on Property," states:

    The defendant is not guilty of murder if he killed to defend himself in the defendant's home. Such a killing is justified, and therefore not unlawful, if:
        "1 The defendant reasonably believed that he was defending a home against <insert name of decedent>, who (intended to or tried to commit <insert forcible and atrocious crime> / [or] violently[[,][or] riotously[,]/ [or] tumultuously] tried to enter that home intending to commit an act of violence against someone inside);
        "2 The defendant reasonably believed that the danger was imminent;
        "3 The defendant reasonably believed that the use of deadly force was necessary to defend against the danger; AND
        "4 The defendant used no more force than was reasonably necessary to defend against the danger.
        Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of violence to himself.  Defendant's belief must have been reasonable and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, then the killing was not justified. [¶] When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed. [¶] ... The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder."

habitation of another for the purpose of offering violence to any person therein." The trial court declined to give the CALCRIM 506 instruction because "there was not sufficient evidence to warrant the instruction." RT 727-728.   The trial court did, however, give a self-defense instruction.

The California Court of Appeal rejected Rocha's claim that the trial court had erred in not giving the instruction. California law required the court to instruct upon every theory supported by "substantial evidence," which was "evidence sufficient to deserve consideration by the jury, that is, evidence that a reasonable jury could finding (sic) persuasive. . . . Upon request, a defendant is entitled to receive a non-argumentative jury instruction pinpointing the defense theory, regardless of how remote or incredible that theory may be, as long as it finds support in any evidence deserving of consideration." Cal. Ct. App. Opinion, p. 17 (citations and quotation marks omitted).   Here, the requested instruction was properly refused because there was not substantial evidence of a trespass or that Rocha *reasonably* believed he needed to use deadly force to defend his home. *Id.* at 19-20.   Defense of one's home applies where one uses reasonable force to exclude someone he reasonably believes is trespassing in, or about to trespass in, his home. Cal. Ct. App. Opinion, p. 18.   Under California law, the intentional use of deadly force merely to protect property is not reasonable, so a killing caused by the intentional use of deadly force can not be justified by defense of habitation alone. *See id.*   To be justified in the intentional use of deadly force, the defendant must also show either self-defense or defense of others. *See id.* (quoting *People v. Curtis*, 30 Cal. App. 4th 1337, 1360-61 (Cal. Ct. App. 1994)).   The state appellate court noted that a few older cases suggested that a homicide involving the unintentional and accidental use of deadly force may be justified on the ground that it occurred while the defendant was exercising the right of defense of habitation, but even then the defendant had to have a reasonable belief that a trespass was occurring or about to occur. *See id.*

The California appellate court applied the law to reject Rocha's claim:

[Rocha] did not testify that he heard an intruder unlawfully and forcibly enter the residence. He testified that he heard someone walk in through the front door and proceed

to Diana Jeffreys's room. Nor did he testify that the person or persons he suspected of wanting to kill him in order to steal his coin collection were intruders: they were none other than a member of the household (Jeffreys) and her guest. The trial evidence does not contain substantial evidence that an intruder entered defendant's home to rob him. Therefore, defendant was not entitled to an instruction on the defense of habitation.

Furthermore, while defendant's testimony may have supplied substantial evidence he *actually believed* Holland and Jeffreys were out to kill him and steal his coin collection, and that he *actually believed* in the necessity of shooting Holland in the shoulder to defend himself against Holland's knife attack, here, as in *Curtis*, defendant's testimony did not supply substantial evidence that his beliefs were reasonable. In fact, none of the testimony provided any basis for a reasonable person to believe that Holland and Jeffreys wanted to steal defendant's coin collection. Defendant essentially concedes as much in his reply brief when he states that "[f]rom appellant's trial testimony*, his actions may not have constituted justifiable homicide at the time his struggle with Holland began*, but his actions became justifiable homicide or self-defense at the point that Holland grabbed the barrel of appellant's gun...." (Italics added.) Defendant's actions at that later point were the subject of self-defense instructions, which were given. [footnote omitted.] However, because there was no evidence that a reasonable person in defendant's position would have believed on the evidence presented that Holland broke into defendant's home to murder him and steal his coin collection, the trial court had no duty to instruct on defense of habitation.

Cal. Ct. App. Opinion, ¶. 19-20.


2.     Analysis

This court does not revisit whether the instruction should have been given as a matter of state law.  "The court's determination that this instruction was not appropriate and the state appellate court's affirmance of that decision resulted from interpretation of state law.  Any error in the state court's determination of whether state law allowed for an instruction in this case cannot form the basis for federal habeas relief." *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)).

Federal habeas relief is available for the omission of a jury instruction only if the error "'so infected the entire trial that the resulting conviction violate[d] due process.'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973));  *see Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  A defendant generally is entitled to have the jury instructed on his defense theory, but whether a constitutional violation has occurred in the failure to do so will depend on the evidence in the case and the overall instructions given to the jury. *See Duckett v. Godinez*, 67 F.3d 734, 745 (9th Cir. 1995).  There must be some evidence to

support the instruction in order for there to be a duty to instruct. *Id.* at 743; *cf. Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000) (failure to instruct on simple kidnapping was error where defendant wanted to present a defense that he kidnapped but not for the purposes of robbing the victim); *Solis v. Garcia*, 219 F.3d 922, 929-30 (9th Cir. 2000) (no duty to instruct on voluntary manslaughter as lesser included offense to murder because evidence presented at trial precluded a heat of passion or imperfect self-defense instruction; no duty to instruct on involuntary manslaughter because evidence presented at trial implied malice). A state court's finding that the evidence does not support the requested instruction – e.g., a claim of defense of habitation – is entitled to a presumption of correctness on federal habeas review. *See Menendez*, 422 F.3d at 1029.

If a constitutional error is found in the omission of an instruction, the federal habeas court also must determine whether that error was harmless by looking at the actual impact of the error. *Calderon v. Coleman*, 525 U.S. 141, 146-47 (1998). The habeas court must apply the harmless-error test set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and determine whether the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (per curiam) (quoting *Brecht*, 507 U.S. at 623).

The California Court of Appeal's rejection of Rocha's instructional error claim was not contrary to, or an unreasonable application of, clearly established federal law as set forth by the Supreme Court. The state appellate court determined that the instruction was not required because there was not substantial evidence that Rocha had a *reasonable* belief that he needed to use deadly force to defend his home. There was not evidence that Rocha had a reasonable belief that Holland and Jeffreys were out to kill him and steal his coin collection. There also was no evidence of an intruder/trespasser in the residence: Holland was in the residence as the permitted guest of Jeffreys, and Rocha did not present evidence he actually or reasonably believed otherwise.

Other jury instructions that were given provided adequate guidance to the jury in light of Rocha's testimony. The instructions that were given included an instruction on the general

14

principles of homicide (CALCRIM 500), an instruction on self-defense as justifiable homicide (CALCRIM 505), an instruction on accidental killing as excusable homicide (CALCRIM 510), and an instruction on voluntary manslaughter based on imperfect self-defense (CALCRIM 571).[2] If the jurors believed Rocha's claim that he was defending himself against Holland, CALCRIM 505 and CALCRIM 571 would have led them to vote to acquit completely or to find him guilty of only voluntary manslaughter.  The absence of the defense of habitation instruction did not so infect the trial as to make it a denial of due process.

Further, even if the refusal to give the defense of habitation instruction was error, it would have been harmless error.  The prosecution evidence was strong, and Rocha's evidence was very weak.  Rocha's testimony as to what had happened was internally inconsistent, his trial testimony differed in significant respects from his statement to police given hours after the killing, his explanation of the variations between the two stories was implausible, and his story was not supported by the physical evidence.  It can be said with certainty that the omission of the instruction did not have a substantial and injurious effect or influence in determining the jury's verdict.  Rocha is not entitled to the writ on this claim.

B.      Ineffective Assistance of Counsel Claims

The Sixth Amendment to the U.S. Constitution guarantees not only assistance, but effective assistance, of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The purpose of the right is to ensure a fair trial, and the benchmark for judging any claim of ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.*  To prevail on an ineffective assistance claim, a habeas petitioner must show that (1) counsel's

---

[2]The imperfect self-defense instruction told the jury that a killing that otherwise would be a murder is reduced to voluntary manslaughter if the defendant acted while *actually* believing that he was in imminent danger of being killed or suffering great bodily injury and *actually* believed that the immediate use of deadly force was necessary to defend against the danger, but at least one of those actual beliefs was unreasonable. *See* CALCRIM 571.

performance was "deficient," i.e., his "representation fell below an objective standard of reasonableness" under prevailing professional norms, *id.* at 687-88, and (2) prejudice flowed from counsel's performance, i.e., that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different, *see id.* at 691-94.

1.   <u>Withdrawal of Request For Instruction on Involuntary Manslaughter</u>

The California Court of Appeal rejected Rocha's claim that counsel provided ineffective assistance when he withdrew a request for an involuntary manslaughter instruction, CALCRIM 580.[3]

> Defense counsel initially requested an instruction on involuntary manslaughter, CALCRIM 580. [footnote omitted.]  Prior to instruction, however, defense counsel withdrew his request, stating: "You know, Your Honor, I will withdraw that request if I want to maintain any credibility, so...." The court responded: "I nevertheless don't believe that there is sufficient evidence that would warrant giving this instruction based on the facts presented in this trial, so I agree with [defense counsel], and I will not give that instruction." Defendant now claims that counsel was ineffective for withdrawing involuntary manslaughter as a possible verdict from the jury's consideration because defendant "testified at trial that he brandished a gun with the intent to shoot Kenneth ... in the shoulder to get him to drop the knife but had no intent to kill either Holland or Diana Jeffreys [and] the gun went off accidentally when he and Holland were struggling for control of the gun."

> We agree with the trial court that the evidence did not warrant an involuntary manslaughter instruction. Involuntary manslaughter is "the unlawful killing of a human being without malice" that occurs "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (Pen.Code, § 192, subd. (b).)

> Defendant's testimony did not support the theory that defendant acted "without due

---

[3]CALCRIM 580 provides, in relevant part: "When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter. [¶] The difference between other homicide offenses and involuntary manslaughter depends on whether the person was aware of the risk to life that his or her actions created and consciously disregarded that risk. An unlawful killing caused by a willful act done with full knowledge and awareness that the person is endangering the life of another, and done in conscious disregard of that risk, is voluntary manslaughter or murder. An unlawful killing resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life is involuntary manslaughter. [¶] The defendant committed involuntary manslaughter if: [¶] 1 The defendant committed a crime that posed a high risk of death or great bodily injury because of the way in which it was committed or committed a lawful act, but acted with criminal negligence; [¶] AND [¶] 2 The defendant's acts unlawfully caused the death of another person."

16

caution and circumspection" – that is, criminal negligence – when he defended himself from Holland's knife attack by trying to shoot Holland in the shoulder. Nor did it support the theory that defendant *accidentally* shot at Holland's shoulder while committing the misdemeanor offense of brandishing a gun. Defendant's testimony was that while shooting *Jeffreys* was an accident, he grabbed the gun and tried to shoot it at Holland's shoulder while he struggled with Holland in an effort to defend himself from Holland's knife attack. If the jury believed that he unintentionally killed Jeffreys while he was acting in reasonable self-defense, it was duty-bound to acquit him, not convict him of involuntary manslaughter. If the jury believed that defendant unintentionally killed Jeffreys while acting in unreasonable self-defense – the theory of the case to which defense counsel devoted his closing argument, and urged the jury to adopt – the jury was bound to convict him of voluntary manslaughter, not involuntary. (*People v. Blakeley* (2000) 23 Cal.4th 82, 87-91.) Therefore, the court did not err in refusing to instruct on involuntary manslaughter.

Furthermore, defense counsel expressed a perfectly rational tactical purpose for withdrawing his request for an involuntary manslaughter instruction. Defense counsel's statement indicates that he wanted to place the full force of his credibility behind a verdict of voluntary manslaughter. Although defense counsel could have asked for the involuntary manslaughter instructions without explaining involuntary manslaughter to the jury during argument, he chose another path. Defendant has not demonstrated that counsel's tactical decision not to dilute his credibility or divert the jury's attention from voluntary manslaughter was incompetent.

Cal. Ct. App. Opinion, ¶. 22-24.

The California Court of Appeal's rejection of Rocha's claim was not contrary to, or an unreasonable application of, the *Strickland* standard. Rocha was not deprived of effective assistance of counsel by counsel's choice not to request an instruction on involuntary manslaughter. As the state appellate court explained, if the jury believed Rocha, involuntary manslaughter wouldn't have been the right verdict: an acquittal was the appropriate verdict if the jury believed it was an unintentional killing while Rocha acted in reasonable self-defense, and a voluntary manslaughter conviction would have been the appropriate verdict if the jury believed he unintentionally killed the victim while acting in unreasonable self-defense. Rocha has not shown either deficient performance or prejudice in counsel's choice to not have the jury instructed on a theory that did not apply to the facts. Moreover, as the California Court of Appeal indicated, even if the evidence arguably permitted such an instruction, it was a reasonable strategy for counsel to forgo an instruction on involuntary manslaughter so as to preserve his credibility in arguing that the crime was only voluntary manslaughter and not murder. *See Knowles v. Mirzayance*, 556 U.S. 111, 121-23 (2009) (abandoning a defense that

17

1   has "almost no chance of success" is reasonable, even if there is "nothing to lose" by preserving

2   the defense).

3       Further, even if the failure to request the instruction was deficient performance, there was

4   no prejudice.  As mentioned earlier, the prosecution evidence was strong and Rocha's evidence

5   was very weak and self-contradictory.

6

7       2.    Failure To Request Redaction of Police Interview

8       The California Court of Appeal rejected Rocha's argument that defense counsel was

9   ineffective in not seeking a redaction of his interview with police shortly after the shooting.  The

10  court noted that Rocha's statement to the police was admissible under state law as an admission

11  and a prior inconsistent statement, so counsel's failure to object to the admission of the statement

12  was not ineffective assistance.  Cal. Ct. App. Opinion, p. 24.  Then the court explained that it

13  also was not ineffective assistance for counsel not to ask for a redaction of sergeant Souza's

14  comments that reflected disbelief of Rocha's story.

15

16  Defendant also argues that defense counsel should have moved to redact the
    audio/videotape of defendant's police interview to excise Sgt. Souza's comments

17  indicating his skepticism of defendant's statement. In support of his argument, defendant
    cites a number of cases for the proposition that "[t]he officer's opinion that appellant was

18  lying was presumptively prejudicial and inadmissible." However, in each of the
    California cases cited, the officer was a witness who in effect testified at trial that in his

19  expert opinion, the victim was truthful (*People v. Sergill* (1982) 138 Cal.App.3d 34,
    39-40) or the defendant was lying (*People v. Torres* (1995) 33 Cal.App.4th 37). In one

20  of the federal opinions cited by defendant, an investigator's report which contained the
    investigator's opinions of the case was inadvertently sent into the jury room. *(United

21  States v. Harber* (9th Cir.1995) 53 F.3d 236.) In the other federal case, the prosecutor's
    questions of his witnesses implied that he believed the witnesses were telling the truth

22  and the defendant was lying, creating the risk that the jury would think he possessed
    information other than that presented at trial, or perceive the prosecutor as an expert on

23  credibility. (*United States v. McKoy* (9th Cir.1985) 771 F.2d 1207, 1211.) *United States
    v. Young* (1985) 470 U.S. 1, also involved a prosecutor's improper expression of personal

24  opinion and vouching for witnesses, during closing argument. The court acknowledged
    that "such comments can convey the impression that evidence not presented to the jury,

25  but known to the prosecutor, supports the charges against the defendant and can thus
    jeopardize the defendant's right to be tried solely on the basis of the evidence presented

26  to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government
    and may induce the jury to trust the Government's judgment rather than its own view of

27  the evidence"; however, in *Young*, the United States Supreme Court concluded that the
    comments did not have that effect. (*United States v. Young, supra*, 470 U.S. at ¶. 18-19.)

28

18

In this case, Sgt. Souza did not testify as an expert on veracity, nor did he express any opinion during his testimony about defendant's veracity at trial. Sgt. Souza's comments in the videotape were not admitted for the hearsay purpose of proving that defendant was, in fact, lying or even that Souza believed he was. Rather, Souza's comments, made in response to defendant's statements, were admissible for the nonhearsay purpose of showing the context in which defendant's statements were made and his reaction to comments that challenged his story. The videotape posed no danger that the jury would believe that Souza possessed any evidence that the jury did not have before it, or any special expertise in truth-detecting. Thus, even if defense counsel had objected, the trial court would not have abused its discretion in overruling the objection.

Furthermore, we perceive that defense counsel may well have had a tactical reason to want to include Sgt. Souza's comments. Given that defendant's pre-trial statement was likely to be admitted as a party admission and a prior inconsistent statement, Sgt. Souza's comments provided an avenue for defendant to explain the discrepancies between his trial testimony and his pretrial statement.

Finally, even assuming trial counsel erred, we are convinced there is no reasonable probability that, but for counsel's assumed error, the result of the proceeding would have been different. Holland's testimony was consistent with his excited utterances to the dispatcher, his statement to the police, Salazar's prior testimony, and the physical evidence. On the other hand, defendant's testimony was internally inconsistent, at odds in significant respects with his statement to police, and not supported by any physical evidence. In our view, Sgt. Souza's comments could not have influenced the result.

Cal. Ct. App. Opinion, ¶. 24-26.

The California Court of Appeal's rejection of the ineffective assistance of counsel claim was not contrary to, or an unreasonable application of, clearly established federal law as set forth by the U.S. Supreme Court. The state court reasonably distinguished this situation (expressions of disbelief by a police sergeant interviewing a suspect) from that where a witness vouches for another witness or testifies as an expert on another person's credibility. The state appellate court also noted that Souza's statements were not offered to show that Rocha was lying, but instead for the nonhearsay purpose of showing the context of defendant's statements and his reaction to challenges to his story.

Given the numerous inconsistencies between Rocha's statement to the police within hours of the shooting and his trial testimony, Rocha had a lot of explaining to do at trial. Defense counsel could have made a reasonable tactical decision that detective Souza's skeptical comments would help explain why Rocha gave testimony that was inconsistent with his statement to the police. The defense needed to address, among other prior inconsistent statements: Rocha's failure to tell the police that Holland grabbed the gun before the gun

discharged, RT 547; Rocha's statement to the police that he pulled out the gun and shot in an attempt to hit Holland, RT 545, when at trial he testified to an accidental discharge of the weapon, RT 545; Rocha's acknowledgment to the police that he and Holland never touched each other, RT 548, when at trial he described a lengthy struggle with Holland, RT 515-517; and why Rocha told Souza that "in a lot of instances" he kept the gun cocked and in a holster, RT 603, when at trial he claimed that this was the first time he ever loaded it, RT 600, 603, and didn't intend to fire it until it was checked by a gunsmith, RT 582-584.  When Rocha was asked at trial why his testimony differed from that given to the police shortly after the shooting, he claimed he had seen no reason to tell the police the truth in light of their skepticism, and negative attitudes.  *See* RT 545-549, 603-606, 637, 640.  This portion of Rocha's story was made slightly less unbelievable when the jury heard the police interview that included Souza's comments indicating his disbelief of Rocha.   Rocha's claim ultimately represents nothing more than a difference of opinion about the best trial tactics to deal with the problem of his inconsistent statements, but that does not establish that he was denied effective assistance of counsel. *See Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984); *see also Knowles v. Mirzayance*, 556 U.S. at 121-23 (abandoning a defense that has "almost no chance of success" is reasonable, even if there is "nothing to lose" by preserving the defense); *see also McDowell v. Calderon*, 107 F.3d 1351, 1358 (9th Cir.) (no ineffective assistance where counsel's decision to concede guilt of felony murder but contest defendant's intent to kill "best choice from a poor lot"), *amended*, 116 F.3d 364 (9th Cir.), *vacated in part by* 130 F.3d 833, 835 (9th Cir. 1997) (en banc).  Rocha is not entitled to the writ on his claims that counsel provided ineffective assistance at trial.

C.     No Certificate Of Appealability

A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in which "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

20

**CONCLUSION**

The petition for writ of habeas corpus is denied on the merits.

The clerk will close the file.

**IT IS SO ORDERED**.

DATED: August 17,  2012

_____
SUSAN ILLSTON
United States District Judge

21